UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| RONALD E. JONES, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:19-cv-06883 |
| | : | <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
| | : | COMPLAINT FOR VIOLATIONS OF THE |
| vs. | : : | FEDERAL SECURITIES LAWS |
| | : | |
| CANNTRUST HOLDINGS INC., PETER ACETO and GREG GUYATT, | : : : | |
| | : | |
| Defendants. | : : | |
| | : | |
| ———————————————— x | | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Ronald E. Jones ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by CannTrust Holdings Inc. ("CannTrust" or "the Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all purchasers of CannTrust common stock between February 25, 2019 and July 12, 2019, inclusive (the "Class Period"), against CannTrust and certain of the Company's executive officers seeking remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2.      CannTrust produces and distributes recreational and medicinal cannabis products. CannTrust's products include dried flower, capsules, oil tinctures, and topicals, along with products for the pet and coffee markets.

3.      CannTrust operates under a multi-layered legal framework in Canada.  The Canadian market for medicinal products is primarily regulated at the federal level.  CannTrust is a "Licensed Producer" of medicinal cannabis under Canada's Access to Cannabis for Medical Purposes Regulations ("ACMPR").  This designation subjects CannTrust to certain regulations (*e.g.*, requiring security for facilities) and reporting requirements, as well as to unscheduled site inspections by Health Canada, the agency primarily responsible for regulating the cultivation and marketing of cannabis products in Canada.

4.      The ACMPR also requires the Company to obtain facility- and room-specific licenses for each location in which it cultivates, processes, and stores its products.  According to the Company, it has sought and received its ACMPR Licenses for two facilities, one located in Pelham, Ontario, which the Company refers to as the "Pelham Facility" or "Niagara Facility," and the other located in Vaughan, Ontario, which the Company calls the "Vaughan Facility."

5.      At the start of the Class Period, Health Canada had licensed these facilities for certain activities, such as the indoor cultivation of cannabis, but not for other activities, such as outdoor cultivation.  In addition, not all rooms within each facility were licensed for certain activities, such as cultivation.  Nevertheless, CannTrust improperly used these facilities to cultivate cannabis without the necessary licenses and included the proceeds from illegally grown cannabis in the Company's financial results.  The failure of CannTrust to receive the proper licenses for the cultivation of cannabis at these facilities was of material importance to investors, because such failure negatively impacted the Company's ability to generate and grow revenues and subjected the Company to adverse regulatory actions.  CannTrust's revenues are derived almost entirely from the sale of dried cannabis and cannabis extracts.

6.      On October 17, 2018, Canada legalized the distribution of recreational cannabis.  In doing so, the federal government required companies to be federally licensed, but largely delegated other regulatory matters to the Canadian provinces, including responsibility for regulating sale and distribution, minimum age requirements, places where cannabis can be consumed, and other matters.  On November 14, 2018, defendants reported that CannTrust was "one of only four producers with at least nine provincial agreements" permitting the cultivation and sale of recreational cannabis products.

- 2 -

7.     Defendants have declared their intention to expand CannTrust internationally, especially after Canada and other countries loosened regulation of recreational cannabis products. Health Canada requires companies to apply for licenses to export such products.  On November 6, 2017, CannTrust received Health Canada approval to export medical marijuana internationally to countries where medical marijuana is legalized, and the Company began shipping to Australia.  On March 13, 2018, the Company announced it had entered into a joint venture with a company in Denmark to distribute its products.  As discussed below, during the Class Period the Company announced its intention to begin exporting to the United States, beginning with the state of California.

8.     Defendants' expansion plans were fueled in significant measure by the desire to seize the market opportunity created by the legalization of recreational cannabis in Canada and in other countries (as well as states within the United States).

9.     The other key component of defendants' growth plans was their strategy to significantly expand CannTrust's production of cannabis.  Prior to and during the Class Period defendants laid out to investors a three-phase plan to support this strategy.  The Company's May 3, 2019 Prospectus, for example, described the phases of their expansion strategy as follows:

> We have completed the Phase 1 redevelopment of the Niagara Facility which is approximately 250,000 square feet and the Phase 2 expansion of approximately 200,000 square feet to which Health Canada granted a cultivation and production license.  On October 24, 2018, we purchased a 19.4 acre property adjacent to the Niagara Facility and will begin construction of an additional 390,000 square foot Phase 3 expansion on that land.  On January 22, 2019, we obtained all necessary permits from the Town of Pelham (where the Niagara Facility is located) for the Phase 3 expansion, which is expected to be completed during 2020.  After completion of the Phase 3 expansion, the Company expects the Niagara Facility to have a total production capacity of approximately 100,000 kg per year.  The Company expects to have more than 800,000 square feet of production capacity after completion of all phases of the Niagara Facility expansion.

10.     In early 2019, CannTrust also began listing its common shares on the NYSE, which increased liquidity and demand for CannTrust stock.  These actions and statements to investors pushed the price of CannTrust stock to near record highs.  Then, in May 2019, defendants conducted a public offering of CannTrust common shares (the "Secondary Offering").  In the Secondary Offering, defendants sold over 36 million CannTrust shares at $5.50 per share, for nearly $200 million in gross proceeds.

11.     But as demand started to outpace supply, unbeknownst to investors, CannTrust had cut corners, lied to regulators, and illegally grown cannabis at its facilities in order to continue to show revenue and sales growth.  Then, on July 8, 2019, the Company issued a press release revealing that Health Canada had discovered during an audit of the Company that it had been growing cannabis in five unlicensed rooms at the Niagara Facility over a six-month period and had provided misleading information to the regulator.  The Company also announced that Health Canada had placed a hold on a significant quantity of CannTrust's cannabis inventory, and that CannTrust had placed a voluntary hold on additional inventory as Health Canada investigated just how far CannTrust's wrongdoing extended.

12.     On this news, the price of CannTrust common stock dropped from a close of $4.94 per share on Friday July 5, 2019 to a close of $3.83 per share on Monday July 8, 2019, a decline of more than 22%.

13.     Two days later, a whistleblower who said he worked at the Niagara Facility alleged that CannTrust had created fake walls to conceal from regulators the fact that the Company was growing cannabis in unlicensed rooms.  CannTrust now faces the possibility of not only fines and criminal charges, but stiffer penalties, up to and including the loss of its licenses to operate, which would pose an existential threat the Company.

- 4 -

14.     Then, on July 12, 2019, CannTrust announced that it had implemented a voluntary and indefinite hold on **all** of its products pending an internal review and the results of the investigation by Health Canada.

15.     On this news, the price of CannTrust common stock dropped from a close of $3.11 per share on July 11, 2019 to a close of $2.58 per share on July 12, 2019, a decline of more than 17%.  This represented a greater than 50% decline from the price at which defendants had sold $200 million worth of CannTrust stock to the investing public only two months before in the Secondary Offering.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and §27 of the 1934 Act.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  A substantial number of the acts and omissions giving rise to the claims at issue occurred in this District.

18.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

19.     Plaintiff Ronald E. Jones purchased CannTrust common stock during the Class Period and was injured as reflected in the attached Certification.

20.     Defendant CannTrust Holdings Inc. is an Ontario, Canada-based "Licensed Producer" of cannabis products.  On February 25, 2019, the Company's common stock started trading on the

- 5 -

NYSE under the ticker symbol "CTST."  Prior to February 25, 2019, the stock traded over-the-counter in the United States.  CannTrust stock also trades on the Toronto Stock Exchange under the ticker symbol "TRST."

21.     Defendant Peter Aceto ("Aceto") served as Chief Executive Officer ("CEO") of the Company throughout the Class Period.

22.     Defendant Greg Guyatt ("Guyatt") served as the Chief Financial Officer ("CFO") of the Company throughout the Class Period.

23.     The defendants referenced above in ¶¶21-22 are also referred to herein as the "Individual Defendants" and are liable under §§10(b) and 20(a) of the 1934 Act for CannTrust's fraud.

24.     During the Class Period, the Individual Defendants, as senior executive officers of CannTrust, were privy to confidential, proprietary information concerning CannTrust, its finances, operations, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning CannTrust as discussed in detail below.  Because of their positions with the Company, the Individual Defendants had access to non-public information about CannTrust's finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of CannTrust's business.

26.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of CannTrust's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

27.     As senior executive officers and as controlling persons of a publicly traded company whose stock was, and is, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to CannTrust's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue so that the market price of CannTrust stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## BACKGROUND TO THE CLASS PERIOD

28.     On November 14, 2018, CannTrust issued a press release titled "CannTrust Reports Record Revenue for Q3 2018 and is Taking Steps to List on the New York Stock Exchange" (the "3Q18 Release").  In the release, CannTrust made a number of announcements, including its intention to list on the NYSE, that the Company had "[e]ntered into supply agreements with 9 Canadian provinces to supply recreational cannabis across Canada" and a strategic partnership with an Australian licensed producer, and that the Company had made its first shipment of cannabis oils to Denmark.  The Company also provided its financial results for the nine months ended September 30, 2018, including (in Canadian dollars) revenue of $29 million, net income of $12 million, and earnings per share ("EPS") of $0.12.

29.     In addition, CannTrust hosted a conference call on November 14, 2018 to discuss the Company's financial results.  During the call, defendants reiterated the financial results and news about the Company's plans for expansion provided in the 3Q18 Release.  In summarizing the Company's performance and operational results, defendant Aceto stated: "We're very pleased with our rate of revenue growth and are keen to deliver more for our shareholders, especially given the legalization of cannabis in Canada during the fourth quarter."  Defendant Aceto also took a question from an analyst about CannTrust's ability to "replenish[] and resupply[] across provinces."  In response, Aceto reassured investors that CannTrust was effectively resupplying the market with its product as part of the Company's focus on operational improvements:

> [A]s I said, we've seen – what we've provided to the provinces move very, very quickly.  And every day, we make improvements operationally as well as with our partners in the entire value chain to get shipments out to the provinces.  So we are probably shipping product to the provinces on a daily basis.  So we continue to do that and we get more efficient every single day.

30.     Also on November 14, 2018, the Company filed its financial report for the third quarter of 2018 and accompanying Management's Discussion and Analysis ("MD&A") with the

Canadian Securities Administrators (on SEDAR at www.sedar.com) and a certification on Form 52-109F2 that represented that the filing contained no misrepresentations.  Both the report and MD&A repeated the Company's financial results and operational updates described in the 3Q18 Release and earnings call.

31.     On January 8, 2019, CannTrust filed a Registration Statement on Form 40-F with the SEC in order to register its common shares for trading on the NYSE.  After several amendments, CannTrust shares began trading on the NYSE on February 25, 2019.

32.     The Registration Statement incorporated a number of documents by reference, such as the Company's Prospectus, filed on May 29, 2018, and Annual Report for 2017, filed on March 29, 2018.  While these documents acknowledged that CannTrust's business could suffer in the future due to the "impact of Health Canada's compliance regime," and thus the material importance of complying with applicable regulations, they failed to disclose that the Company had **already** failed to obtain necessary licenses for the cultivation of cannabis at its facilities and had attempted to conceal its illegal activities from regulators.

33.     Indeed, the Registration Statement claimed that defendants routinely inspected the Company's facilities and that CannTrust was in compliance with all relevant laws, including maintaining all necessary licenses.  For example, the 2017 Annual Report, and other documents incorporated by reference, in a section titled "Change in Laws, Regulations and Guidelines," stated in pertinent part:

> ***The Company's operations are subject to various laws, regulations and guidelines relating to the manufacture, management, transportation, storage and disposal of medical cannabis as well as laws and regulations relating to health and safety, the conduct of operations and the protection of the environment***.  To the knowledge of management, other than the requirement that the Company make routine corrections that may be required by Health Canada from time to time, ***the Company is currently in compliance with all such laws***. . . .

- 9 -

Health Canada inspectors routinely assess the Vaughan Facility and the Niagara Facility against ACMPR regulations and provide the Company with follow up reports noting observed deficiencies. ***The Company is continuously reviewing and enhancing its operational procedures at the Vaughan Facility and the Niagara Facility both proactively and in response to routine inspections. The Company follows all regulatory requirements*** in response to inspections in a timely manner.

34.     These documents also represented that CannTrust had "sought and received" the

necessary licenses, stating in pertinent part:

> ***The Company has sought and received its ACMPR Licenses for the Vaughan Facility and Niagara Facility*** which each provide for (a) the production and sale of dried cannabis; (b) the production and sale of cannabis oil (c) the production and sale of cannabis in its natural form: cannabis resin; (d) the production and sale of cannabis plants; and (e) the production and sale of cannabis seeds.

35.     As defendants knew or recklessly disregarded, the statements in ¶¶28-34 were

materially false and misleading at the time they were made because they failed to disclose the

adverse facts listed in ¶51. These false and misleading statements remained alive in the market and

uncorrected at the start of the Class Period.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

36.     The Class Period begins on February 25, 2019. On that day, CannTrust shares began

trading on the NYSE. Prior to and throughout the Class Period, defendants artificially inflated the

trading price of CannTrust stock by issuing false and misleading statements and omitting to disclose

material facts necessary to make defendants' statements, as set forth below and above, not false and

misleading at the time they were made.

37.     On March 28, 2019, CannTrust issued a press release titled "CannTrust Reports

Financial Results for Q4 2018." In the release, CannTrust provided its fourth quarter ("4Q18")

financial results, including (in Canadian dollars) revenue of $16 million, a net loss of $26 million,

and EPS of ($0.26). CannTrust also provided its annual ("FY18") financial results, including (in

Canadian dollars) revenue of $45 million, a net loss of $13 million, and EPS of ($0.14).  Defendant

Aceto was quoted in the release as stating in pertinent part:

> "*The CannTrust team has delivered remarkable growth in the fourth quarter of 2018.  We achieved record sales volume, record revenue and our medical patient count continues to increase, reflecting the quality of our products and customer service* . . . ."

> "*We expect the trajectory of revenue growth to continue in 2019 as we bring additional capacity online through our Phase 2 expansion, realize the potential of investments we have made into training and crop yield optimization, implement targeted price increases and distribute our products to more and more consumers*.  Additionally, CannTrust expects to take bold action to achieve leadership in growing cannabis outdoors.  We have entered into Letters of Intent to secure approximately 200 acres of land, which we estimate will add an additional 100,000kg to 200,000kg of production in 2020, subject to regulatory approvals.  In combination with our Phase 3 expansion, we estimate our annual production capacity target to be between 200,000kg and 300,000kg.  We also plan to become an early-mover in vaporization products and develop further partnerships to bring innovative products to market.  *These initiatives are the result of thoughtful and calculated work the Company has performed in assessing its growth strategy*.  This is truly a very exciting time for CannTrust . . . ."

38.     The Company repeated the 4Q18 and FY18 financial results from the press release in

a financial report filed on Form 40-F the same day (the "2018 Form 40-F"), and attached Sarbanes-

Oxley certifications by Aceto and Guyatt stating that each of them had reviewed the financial report

and attested to its accuracy.

39.     The 2018 Form 40-F touted CannTrust's purported status as "a widely recognized,

industry-leading, *licensed producer* ('LP') of cannabis in Canada" and that CannTrust "follows all

regulatory requirements," stating in pertinent part:

> Health Canada conducts ad hoc, unscheduled site inspections of licensed producers.  Health Canada inspectors assess the Vaughan Facility and the Niagara Facility on a monthly basis against Cannabis Regulations and provide the Company with follow up reports noting observed deficiencies.  The Company is continuously reviewing and enhancing its operational procedures at the Vaughan Facility and the Niagara Facility both proactively and in response to routine inspections.  *The Company follows all regulatory requirements in response to inspections in a timely manner.  As of the date hereof, there are no outstanding inspection issues with*

***Health Canada beyond day-to-day adjustments that may occur in order to ensure ongoing compliance***.

40.     The 2018 Form 40-F also included an MD&A section representing that CannTrust had "substantially completed" its Phase 2 expansion of production at the Niagara Facility, which would purportedly drive a return to profitability in 2019, and stating in pertinent part:

> Profitability is expected to improve following the full realization of the increased operational capacity of the Phase 2 expansion.  As the Phase 2 expansion contributes to positive operating leverage, the Company is targeting a return to profitability.  CannTrust expects that its gross margin before fair value changes to biological assets should increase throughout 2019 as the Company increases its production levels and gains production efficiencies.

*     *     *

> The Company received its Health Canada Sales License for the Perpetual Harvest Facility in February 2018.  The Phase 2 expansion at the Perpetual Harvest Facility was substantially completed during the first quarter of 2019.

41.     Also on March 28, 2019, defendants Aceto and Guyatt hosted an earnings call to discuss the 4Q18 and FY18 financial results.  During the call, defendant Aceto reassured investors that CannTrust was improving its processes to make sure the Company remained in compliance with federal and provincial laws and regulations, stating in pertinent part:

> ***[W]e're fortunate enough to be one of the licensed producers who's in 9 provinces***, and we're enjoying our relationships with all of them.  The demand – certainly, the demand versus supply matter continues to persist, and we're working hard to make sure we have quality product for both our medical patients and also our customers in the 9 provinces.  I'd say that we're – ***through the measures that I mentioned before with regards to training and process improvement, we're seeing an improvement there and certainly expect that to continue throughout 2019***.

42.     During the March 28, 2019 call, defendant Aceto also represented that CannTrust was waiting for a "final license" from Health Canada to begin Phase 2 production and was "respectful" of the need to remain in full compliance with applicable licensing requirements, stating for example:

[Analyst:]  And what licensing, if any, is still outstanding for the Phase 2 part?

[Aceto:]  Yes.  So the construction is complete on Phase 2, and *we await final license*.  So we have a broad license which we make amendments to, which has created sort of efficiency in our process with Health Canada.  But *there still remains our last few rooms that we await Health Canada approval from, and we will continue to wait for that*.  Their turnaround times have been generally reasonable. So the last rooms, we await final licensing for.

\*        \*        \*

[O]ur rooms in our perpetual harvest greenhouse need to be licensed by Health Canada.  So *that's something we're respectful* of . . . .

\*        \*        \*

Phase 2 has ramped up gradually throughout the year, only being completed very recently and not all rooms are fully licensed.

43.     On April 5, 2019, CannTrust filed an amended annual report on Form 40/A, which repeated and reaffirmed the financial and operation statements from the 2018 Form 40-F and the Individual Defendants' certifications attesting to their accuracy.

44.     On April 8, 2019, CannTrust issued a press release titled "CannTrust Receives Health Canada Approval for Phase 2 Expansion."  The press release stated in pertinent part:

CannTrust . . . is pleased to announce that its cultivation and processing permit under Health Canada Cannabis Regulations was amended to include the final 20% of its Phase 2 expansion.  *The entire 450,000 sq. ft. of its perpetual harvest greenhouse in Pelham, Ontario, is now fully licensed*.

*"We have always been confident that our processes meet and exceed regulatory standards, and we now have further validation of this from our regulators*," said Peter Aceto, Chief Executive Officer.  "With this approval, CannTrust is set to meet its plan to reach 50,000kg of annualized capacity at the perpetual harvest greenhouse and continue providing award-winning products in a cost-effective manner."

CannTrust's expected production ramp is as follows:

•     The last 20% of the Phase 2 expansion is expected to be operating at *full capacity by the end of Q2 2019*.

•     Pending Health Canada approval, the Company anticipates planting on its previously announced outdoor land acquisition of 81 acres in Q2 2019 and

- 13 -

expects to realize a yield of approximately 1,000kg per acre in 2019.  Total 2019 production from this harvest is expected to be approximately 75,000kg.

45.     On May 3, 2019, CannTrust filed a Prospectus for the offer and sale of over 36 million CannTrust common shares at $5.50 a share, which would generate gross proceeds of approximately $200 million.

46.     The May 3, 2019 Prospectus contained many of the false and misleading statements outlined above.  In addition, it claimed that CannTrust was "fully licensed" and expected to significantly increase production in the year pursuant to such licenses, stating, for example:

> In April 2019, our cultivation and processing permit under Health Canada Cannabis Regulations was amended to include the final 20% of our Phase 2 expansion, which is now *fully licensed*.  With the Phase 2 expansion, we expect full production to be achieved by the end of the second quarter of 2019 at an annualized rate of 50,000 kg per year.
>
> In the quarter ended March 31, 2019, we made capital investments to enhance our extraction capability, which we believe will triple our annual extraction capacity.

47.     On May 14, 2019, CannTrust issued a press release titled "CannTrust Reports Financial Results for Q1 2019" (the "1Q19 Release").  In the release, CannTrust provided its first quarter financial results, including (in Canadian dollars) revenue of $17 million, net income of $13 million and EPS of $0.12.  The 1Q19 Release quoted defendant Aceto as stating in pertinent part:

> "***The CannTrust team delivered exceptional operational growth in the first quarter, with harvested production of over 9,400kg.  This is a 96% increase in production over the prior quarter and reflects the impact of the investments made into our facilities, as well as process improvements to increase throughput*** . . . ."

48.     The Company repeated the financial results from the 1Q19 Release in a financial report filed on Form 6-K that same day, which included certifications by defendants Aceto and Guyatt representing that each of them had reviewed the financial report and attested to its accuracy.  The Form 6-K again highlighted CannTrust's status as "a Licensed Producer and distributor of medical and recreational cannabis pursuant to the provisions of the Cannabis Act" and stated that the

Company had purportedly obtained the appropriate licenses for the Vaughn Facility and the Niagara

Facility, stating in pertinent part:

> ***CannTrust received its license from Health Canada in June 2014, and begun production of medical cannabis at its hydroponic indoor facility in Vaughan, Ontario (the "Vaughan Facility")***.  In 2018, the Company repurposed the Vaughan Facility from a grow facility into a state-of-the-art extraction, manufacturing and packaging facility of approximately 60,000 square feet, including an in-house quality control laboratory.  The Company owns and operates an approximately 450,000 square foot perpetual harvest facility in the Niagara region (the "Perpetual Harvest Facility"), which is expected to have an annual capacity of approximately 50,000 kilograms.  The planned Phase 3 expansion is expected to increase the annual capacity of the Perpetual Harvest Facility to 100,000 kilograms upon its completion.

*       *       *

> In October 2017, CannTrust received its Health Canada Cultivation Licence under the ACMPR for its completed 250,000 square foot Phase 1 redevelopment of the Perpetual Harvest Facility and began production there.  The redevelopment of the Perpetual Harvest Facility was Canada's first automated perpetual harvest designed specifically for this scale of cannabis production.  The Company received its Health Canada Sales License for the Perpetual Harvest Facility in February 2018.  The Phase 2 expansion at the Perpetual Harvest Facility was substantially completed during the first quarter of 2019, and ***is as of the date of this MD&A, fully licensed by Health Canada***.

*       *       *

> The Company received its Health Canada License under the ACMPR on October 6, 2017 for the Phase 1 redevelopment.  On February 12, 2018 the Company obtained its Health Canada sales license under the ACMPR and began operating Phase 1 at full capacity.  The 200,000 square foot Phase 2 expansion at the Perpetual Harvest Facility was substantially completed in the first quarter of 2019 and ***was fully licensed as of April 2019***.

49.     Also on May 14, 2019, defendants Aceto and Guyatt hosted an earnings call to

discuss CannTrust's first quarter 2019 financial results.  During the call, defendant Aceto told

investors that CannTrust's Phase 2 expansion was now fully licensed, stating in pertinent part:

> In April, we received Health Canada approval for the remaining 20% of our Phase II greenhouse.  We expect that production will continue to increase to the full promised annualized capacity of 50,000 kilograms in the third quarter of this year.

- 15 -

\*       \*       \*

*I think with phase II being completed, being fully licensed, where we're very close to being at full production capacity at the 50,000 kilograms, we certainly be [sic] in a better position to meet all of the stakeholder needs*.

50.    On June 19, 2019, the Company issued a press release titled "CannTrust Establishes U.S. Operations."  The press release announced that CannTrust was establishing operations in the United States by starting in the state of California.  In the press release, defendant Aceto claimed that CannTrust was "an experienced operator **meeting rigorous regulatory standards**" and, therefore, that "CannTrust [was] well positioned to execute on this cultivation, processing and formulation strategy with the goal of becoming a leading supplier of hemp-derived CBD products in the U.S."

51.    The statements referenced in ¶¶37-44 and 46-50 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)    that the Company had violated Canadian law by planting, growing, and harvesting cannabis at five unlicensed grow rooms at the Niagara Facility (located in the Phase 2 portion of CannTrust's expansion) between October 2018 and March 2019;

(b)    that the Company had violated Canadian law by shipping cannabis products produced from the cannabis grown in unlicensed rooms;

(c)    that the Company had provided misleading information to Health Canada about its compliance with applicable cultivation regulations and had installed fake walls at the Niagara Facility in order to conceal its illegal growing activities;

(d)    that the Company's reported sales, revenues, earnings, and net income since October 2018 had been artificially inflated by the inclusion of illicit proceeds from illegal cannabis cultivation; and

- 16 -

(e)     that, as a result of (a)-(d) above, the Company faced significant undisclosed legal and regulatory risks that imperiled its ability to grow and sell cannabis products and continue its expansion plans.

52.     Then, on July 8, 2019, CannTrust issued a press release titled "CannTrust Statement Regarding Health Canada Audit."  The press release shocked investors by revealing that CannTrust had grown cannabis in "five unlicensed rooms" (out of 12 total rooms) at the Niagara Facility from October 2018 to March 2019.  Health Canada also found that "inaccurate information [was] provided to the regulator by CannTrust employees." As a result, the Niagara Facility was "non-compliant with certain regulations."  The press release noted that "CannTrust has accepted Health Canada's non-compliance finding."  It also quoted defendant Aceto, who admitted culpability: "'***We made errors in judgement*** . . . .'"

53.     In addition to reporting at least some of the Company's violations, the press release revealed that Health Canada's findings would have an immediate and significant impact on CannTrust's business and would adversely affect the Company's Vaughan Facility as well as the Niagara Facility.  As stated in the release:

> Health Canada has placed a hold on inventory which includes approximately 5,200kg of dried cannabis that was harvested in the previously unlicensed rooms in Pelham, until it deems that the Company is compliant with regulations.  In addition, CannTrust has instituted a voluntary hold of approximately 7,500kg of dried cannabis equivalent at its Vaughan manufacturing facility that was produced in the previously unlicensed rooms.
>
>      . . . Due to the product on hold, some CannTrust customers and patients will experience temporary product shortages.

54.     Also on July 8, 2019, Aceto gave an interview to Canadian media outlet the *Financial Post*.  In that interview, reproduced in an article titled "CannTrust had already shipped 'some' unlicensed cannabis to provinces before Health Canada halt: CEO," defendant Aceto admitted that "'***mistakes were absolutely made at CannTrust***.'"

55.     On this news, the price of CannTrust common stock dropped from a close of $4.94 per share on Friday July 5, 2019 to a close of $3.83 per share on Monday July 8, 2019, a decline of more than 22%, on trading volume of approximately 16.5 million shares (up from approximately 2 million shares traded the previous trading day).

56.     The bad news for the Company's investors continued on July 10, 2019, when the *Globe and Mail* published an article describing the allegations of a CannTrust whistleblower.  As reported by the *Financial Post* in a July 11, 2019 article titled "CannTrust whistleblower says Health Canada would never have found unlicensed rooms without him," CannTrust's use of unlicensed rooms was no accident.  It stated in pertinent part:

> A former CannTrust Holdings Inc. employee believes that had he not blown the whistle on his former employer, Health Canada would not have discovered that the cannabis producer was growing plants in five unlicensed rooms.
>
> Nick Lalonde, who said he was responsible for the disposal of cannabis at a Pelham, Ont., greenhouse for nearly two years, wrote an email to Health Canada on June 14, detailing how CannTrust was allegedly violating regulations by growing cannabis in an unlicensed room.  The company, Lalonde alleged in his email, took extensive measures, such as hanging white poly walls, to hide thousands of cannabis plants from Health Canada.  Details of Lalonde's email and his allegations about the company's actions were first reported Wednesday by the Globe and Mail.
>
> *          *          *
>
> Health Canada visited the greenhouse two days after Lalonde sent the email. . . .
>
> In the email, which was also obtained by the Financial Post, Lalonde told Health Canada that he had been asked to hang the white poly walls so that a greenhouse room could appear empty in photos the company submitted to have it licensed for growing.  Lalonde implored Health Canada to investigate and even suggested how.
>
> *          *          *
>
> A CannTrust spokesperson said the company is "unable to comment on the specific details or the actions of current or former employees."

57.     Then, on or around July 11, 2019, the Alberta Gaming and Liquor Commission and CannTrust's Danish distributor and partner announced that they were "quarantining" CannTrust's already shipped products pending further investigation by Health Canada.

58.     Next, on July 12, 2019, CannTrust issued a press release titled "CannTrust Voluntary Hold On Product Sales and Formation of Independent Special Committee of the Board of Directors." This time, CannTrust announced that it "ha[d] implemented a voluntary hold on sale and shipment of all cannabis products as a precaution while Health Canada visits and reviews its Vaughan, Ontario manufacturing facility."   The press release announced that "the impact of these matters on CannTrust's financial results are unknown until the regulatory review process is complete."   The release did not respond to or otherwise address the whistleblower's claims.

59.     On this news, the price of CannTrust common stock dropped from a close of $3.11 per share on July 11, 2019, to a close of $2.58 per share on July 12, 2019, a one-day decline of more than 17% (with trading volume remaining heavy between July 8 and July 15) and more than 50% below the price at which defendants had publicly offered $200 million worth of CannTrust stock just two months previously.

60.     Investors and analysts immediately understood that CannTrust was in serious jeopardy and that defendants had lost credibility with the market.  A July 15, 2019 article by *BNN Bloomberg*, for example, summarized the fall out: "At least nine analysts have lowered their price target or downgraded their rating on CannTrust since the initial disclosure last Monday, and the company's shares lost almost half their value last week."   According to the report, one analyst, Mackie Research Capital Corp., had gone so far as to "terminate[] coverage of CannTrust," saying "'we have lost faith in management' amid uncertainty about the company's future after recent regulatory infractions."

- 19 -

61.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased CannTrust common stock at artificially inflated prices and suffered significant losses when the relevant truth was revealed in part.

### ADDITIONAL SCIENTER ALLEGATIONS

62.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of CannTrust stock as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CannTrust, their control over, and/or receipt or modification of, CannTrust's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning CannTrust, participated in the fraudulent scheme alleged herein.

63.     The adverse developments at issue also impacted the Company's most important revenue streams and involved the Company's only two facilities of any significance.  Furthermore, the Company's cannabis operations and compliance with Canadian law and Health Canada regulations, including the phased roll-out of the Company's increase in production and related licensing, were overseen by the Individual Defendants as the Company's top executives during the Class Period; their involvement included hands-on oversight of the Company's operations.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

- 20 -

## LOSS CAUSATION/ECONOMIC LOSS

64.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CannTrust stock and operated as a fraud or deceit on purchasers of CannTrust stock.  When the truth about CannTrust's misconduct was revealed, the value of CannTrust stock declined precipitously, as the prior artificial inflation no longer propped up the stock's price.  The declines in the price of CannTrust stock were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of CannTrust stock and the subsequent significant decline in the value of CannTrust stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

65.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and the other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of CannTrust's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of CannTrust stock to be artificially inflated.  Plaintiff and other Class members purchased CannTrust stock at those artificially inflated prices, causing them to suffer damages as complained of herein when the relevant truth was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

66.     At all relevant times, the market for CannTrust common stock was efficient for the following reasons, among others:

(a)     CannTrust common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's 2018 Form 40-F, the Company had over 105 million shares of common stock outstanding as of December 31, 2018, demonstrating a very active and broad market for CannTrust common stock;

(c)     as a regulated issuer, CannTrust filed periodic public reports with the SEC;

(d)     CannTrust regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about CannTrust was rapidly reflected in and incorporated into the price of CannTrust stock during the Class Period.

67.     As a result of the foregoing, the market for CannTrust common stock promptly digested current information regarding CannTrust from publicly available sources and reflected such information in CannTrust's stock price.  Under these circumstances, all purchasers of CannTrust stock during the Class Period suffered similar injury through their purchase of CannTrust stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

68.     This is a class action on behalf of all purchasers of CannTrust common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants

and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

69.     Common questions of law and fact predominate and include: (a) whether defendants violated the 1934 Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the price of CannTrust stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

70.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of CannTrust common stock were actively traded on the NYSE.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.

71.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

72.     Plaintiff incorporates ¶¶1-71 by reference.

73.     During the Class Period, defendant CannTrust and the Individual Defendants disseminated or approved the false statements specified above in ¶¶37-44 and 46-50, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CannTrust securities during the Class Period.

75.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CannTrust common stock and suffered losses when the relevant truth was disclosed.  Plaintiff and the Class would not have purchased CannTrust stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

76.   Plaintiff incorporates ¶¶1-75 by reference.

77.   The Individual Defendants acted as controlling persons of CannTrust within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of CannTrust securities, the Individual Defendants had the power and authority to, and did, cause CannTrust to engage in the wrongful conduct complained of herein.  By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.       Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.       Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  July 24, 2019                    ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                SAMUEL H. RUDMAN

*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

- 25 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
KENNETH J. BLACK
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
kennyb@rgrdlaw.com

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
scotth@johnsonfistel.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

RONALD E. JONES ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 4/24/19 | 2,000 shares | $7.52 |

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22 day of July, 2019.

DocuSigned by:

Ronald E. Jones

_____
RONALD E. JONES

CANNTRUST